## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
Civil Case No.: 0:16-cv-00173 (PAM/ECW)

| | |
|---|---|
| Stewart L. Roark,<br><br>        Plaintiffs,<br><br>    vs.<br><br>Credit One Bank, N.A.<br><br>        Defendant. | **PLAINTIFF'S MEMORANDUM OF LAW OPPOSING DEFENDANT'S MOTION TO FOR SUMMARY JUDGMENT, AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

*"I got upset. I got angry. Sometimes I would cry. Threw my phone on occasion."*

(Deposition of Stewart L. Roark, Tr. 18:2-3). Senator Hollings, a sponsor of the Telephone Consumer Protection Act ("TCPA"), explained his rationale for enacting the TCPA:

> "*Computerized calls are the scourge of modern civilization. They wake us up in the morning; interrupt our dinner at night; force the sick out of bed; they hound us until we want to rip the telephone right out of the wall.*"[1]

Unfortunately, Senator Hollings' statement proved prophetic because that is exactly what happened to Plaintiff Stewart L. Roark ("Plaintiff") – a disabled, military veteran who suffers from various mental, psychological and physical health conditions[2].

---

[1] *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744, 751 (2012) (quoting Statement of Sen. Hollings, 137 Cong. Rec. 30822 (Nov. 7, 1991)) (emphasis added).

[2] It is one thing for Defendant to deny liability for its harassing behavior, it is quite another thing for Defendant to "***play** the victim*" and cast blame on Plaintiff. It very troubling how Defendant can continue to claim that Plaintiff "*did everything he could to maximize the damages he now seeks*" and to claim, "*a deliberate attempt to ratchet up his alleged statutory damages and to sit*

In today's world telephones are not attached to the wall, instead telephones are in our pockets or in our hands at all times. Thus, rather than ripping his "*telephone right out of the wall*", Plaintiff *threw his telephone on the ground* in complete frustration.  In other words, Plaintiff was subject to the exact type of harm and illegal robocalls that the TCPA was intended to abate.

Defendant's motion for summary judgment must be denied. To put it plainly, Defendant drastically misevaluated both the law and the facts, and at times outright ignores the facts. For the reasons mentioned below, Plaintiff respectfully requests that this Court deny Defendant's motion in its entirety.  Conversely, Plaintiff now respectfully asks the Court to grant him summary judgment finding that Defendant not only violated Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"), but did so willfully and/or knowingly, over one hundred and forty (140) times.

## PROCEDURAL BACKGROUND

On January 26, 2016, Plaintiff commenced a lawsuit against Defendant for violations of the TCPA. (*See* Compl. [ECF. 1] ¶¶ 29-33.) On December 6, 2016, the Court entered an Order to Stay this matter pending a decision from the D.C. Circuit Court of Appeals in *ACA International v. FCC*, No. 15-1211 (D.C. Cir. app. dkt'd Jul 10, 2015). (ECF 61, pp. 3-5.) The D.C. Circuit was considering a challenge related to a 2015

---

back while the Bank continued [to call]*." (Def's Memo [ECF. 87] at 1 & 22).  This is even more troubling in light of the fact that <u>hundreds</u> of consumers across the country have alleged identical, if not substantially similar, violations of the TCPA. To that end, Defendant tows the line of Rule 11 by suggesting that Plaintiff intended for Defendant to call him in order to make money.

Federal Communications Commission ("FCC") order, which sought to clarify the type of dialing equipment fell within the TCPA's restrictions. *ACA International v. FCC*, 885 F.3d 687, 691 (D.C. Cir. 2018). On March 16, 2018, court issued its decision in *ACA International*. As such, the stay was lifted on May 3, 2018. (ECF. No. 70.)

On May 7, 2018, Plaintiff filed an Amended Complaint alleging that Defendant (*and/or other persons or entities acting on Defendant's behalf and in Defendant's name, or at Defendant's request*) placed non-emergency telephone calls to Plaintiff's cell phone using an Automated Telephone Dialing System ("ATDS") or prerecorded voice in violation of 47 U.S.C. § 227 (b)(1)(A)(iii). (Am. Compl. [ECF. 74] ¶ 30.) In addition, Plaintiff alleged that Defendant willfully or knowing violated the TCPA. (*Id.* ¶ 32.) Defendant categorically denies placing any calls using an ATDS. (Answer to Am. Compl. [ECF. 77] ¶¶ 6-14, 30.)

## FACTUAL BACKGROUND

Since May 2015, Plaintiff's cellular service provider was Straight Talk Wireless ("Straight Talk") (Roark Decl., ¶¶ 1-6; Strauss Decl., Ex. 1.) Likewise, Plaintiff has been the owner, subscriber, or customer of the cell phone number ending in xxx-xxx-4660 ("Plaintiff's Cell Phone" or "4660 Number") since May 2015. (*Id.*) Between September 24, 2015 through December 16, 2015, Defendant, through its dialing vendors, placed approximately 142 telephone calls to Plaintiff's Cell Phone. (Strauss Decl., Ex. 3.) Defendant does not dispute that it placed the telephone calls at issue to the 4660 Number. (ECF. 87 at 4-8; Strauss Decl., Ex. 2 at p. 1; Ex. 3.) Defendant was attempting to call a

third-party, someone other than Plaintiff, in connection with the collection of a credit card debt. (ECF. 87 at 5-6). The telephone calls were placed, almost every single day, up to 65 times in one week, and up to 10 times in one day. (*Strauss Decl.*, Ex. 3.) Defendant admits that it was not calling for emergency purposes. (ECF. 77 ¶ 27). Plaintiff was not Defendant's customer. (Strauss Decl., Ex. 4 at 84 & 141.) Defendant concedes that Plaintiff never provided his consent to be called. (*Id.*)

Defendant contracts with third-parties to make debt collection calls to Defendant's customers on Defendant's behalf. (*Id.*, Ex. 4 at 40-42; Ex. 6, p. 2; Exs. 7-8.) In this case, Defendant contracted with two third-parties "to perform credit card account collection services on behalf of Credit One . . . ." (*Id.* Ex. 6, p. 2.) Defendant contracted with: "(1) First Contact LLC, c/o iQor ("First Contact"); and (2) iEnergizer Holdings Limited ("iEnergizer")." (*Id.*) Defendant's vendors placed the Telephone Calls to Plaintiff. (*Id.*, Ex. 4 at 40-42; Ex. 6 at 2; Exs. 7-8.) First Contact and iEnergizer always identify themselves as "Credit One Bank" when making calls "Credit One Bank's behalf". (Ex. 4, 141; *see also* 40-42.)

Defendant concedes to using prerecorded messages during the telephone calls to Plaintiff's Cell Phone. (Strauss Decl., Ex. 2 at 2, Ex. 3; ECF. 87 at 2, n. 1 & 22; Ex. 4, p. 124.) In discovery, Plaintiff asked for every instance in which Defendant placed a telephone call to Plaintiff's cellphone. (Strauss Decl. Ex. 2.) In response, Defendant produced a call log bates labeled "COB_000015-21." (hereinafter "Call Logs") (*Id.*, Exs. 2-3.) The code "Play MSG1" and "Virtual msg to AUTOVOICE" indicate the use of a

4

prerecorded message. (*Id.*)

Gary Harwood testified on behalf Defendant in this matter.  (*Id.* Exs. 2, 4.) Mr. Harwood is the Vice President of Portfolio Services for Defendant. (*Id.*, Ex. 4, pp. 11-15.) Mr. Harwood testified to the following:

- Mr. Hardwood has been in the collections industry for over twenty years, he has been with Defendant since 1996, he is certified on the Davox and Melita dialer, and he has training on the Avaya Version 9 Dialer.  (*Id.* at 11-15.);

- When calling Plaintiff, First Contact used only one dialing system, the aQrate dialing system. (*Id.* at 54-56.);

- When calling Plaintiff, iEnergizer used one dialing system, the Aspect Unified IP dialing system. (*Id.* at 54-56, 86.);

- Each dialing system used to place the calls to Plaintiff (i.e., Aspect Unified IP and aQrate), "*places the calls* and screens the calls *prior* to send live voices to a collection agent." (*Id.* at 54-56, 86.) (emphasis added);

- Based on Mr. Harwood's understanding, each dialing system used to place the calls to Plaintiff (i.e., Aspect Unified IP and aQrate) was a predictive dialer. (*Id*. at 64.);

- In Mr. Harwood's understanding, a predictive dialer takes "the account information" and "phone numbers" provided by Defendant and "predict[s] how many phone calls to place once an agent becomes available to provide a live voice on the other end of that agent." (*Id.* at 57.);

- "[Aspect Unified IP] is the only system *that makes the phone calls for the agent.*" (*Id.* at 86.);

- "[An iEnergizer] agent *could manually dial* -- through their switch, manually dial phone numbers . . . *in the same manner that you would make a phone call, they can dial -- punch in the actual numbers into a phone* -- . . . *into the phone and make the phone calls.*" (*Id.*) (emphasis added);

- iEnergizer *either* used the Aspect Unified IP *or* their agents "*can employ manually dialing techniques.*" (*Id.* at 86-87.) (emphasis added);

5

- *Manual* phone calls are *something separate* from making a phone call through Aspect Unified IP. (*Id.* at 86.);

- "[Account Notes] *only* reflects those accounts that were *actually* worked by a collection or customer case agent." (*Id.* at 95.) (emphasis added);

- If an outbound telephone call is referenced in the Account Notes, it means an agent *manually* placed the telephone call.  (*Id.* at 91-96.);

- "If [a call was placed] within either the Aspect or the aQrate system *that would not have been passed to an agent*. So there would have been no agent making a collection comment [in the Account Notes] so it can be assumed that that is *a manual attempt*." (*Id.* at 95.) (emphasis added);

- If a telephone call is reflected on the Call Logs, but it is not reflected on the Account Notes, that indicates the telephone call was made *without an agent* – i.e., "an "*agent-less* phone call." (*Id.* at 95-96.) (emphasis added);

- The Call Logs indicate that a call was placed. (*Id.* at 110, 124.);

- Defendant provides its vendors with accounts and phone numbers and the vendors determine which numbers to call. (*Id.* at 142.);

- Defendant uploads account information and phone numbers to First Contact and iEnergizer on a nightly basis. (*Id.* at 50-51.);

- Defendant chose iEnergizer and aQrate through a due diligence process. (*Id.* at 44.);

- Part of the due diligence process is to review all of the potential vendor's systems.  (*Id.* at 50.); and

- Aspect Unified IP and aQrate call and dial the numbers, and "*when [the dialing system] detects a live voice, it will transfer to an agent.*" (*Id.*) (emphasis added).

When asked how Defendant is able to determine if it is calling *a person's cell phone*, Defendant responded, "We don't make that determination because we have express consent on all numbers the customer provides us to dial."  (*Id.* at 76; *see also id.*

6

at 112.)  Defendant does not use any "skip tracing" technology to locate information for its customers.  (*Id.* at 117.) Defendant *does* have access to cell phone scrubbing technology.  (*Id.* at 117-118.) Defendant does *not* do any scrubbing for wireless prefix number for collections.  (*Id.* at 117-18.).

Finally, Defendant was asked about the number of phone calls First Contact and iEnergizer are able to make in a given month.  (*Id* at 158-59.)  Defendant was not able to answer and stated, "any number I give you would be an absolute guess that I would not be comfortable with I would have no clue as to whether I was 90 percent or two percent accurate." (*Id.*) Nonetheless, Defendant was able to answer with 100% certainty that its vendors make more than 100 calls per month.  (*Id.*).  Defendant further testified as follow:

> Q:  Okay.  Well, my question is, you said you are 100 percent certain that Credit -- that First Contact makes more than 100 phone calls each month on behalf of Credit One Bank; correct?
>
> A:  Correct.
>
> Q:  Is there a lowest number in your -- that you feel comfortable saying with 100 percent accuracy?
>
> A:  Yes.
>
> Q:  What number would that be?
>
> A:  2 million.
>
> Q:  Okay.  What about iEnergizer, is there -- just the lowest number that you would feel 100 percent accurate saying, how many phone calls iEnergizer makes on behalf of Credit One Bank in a given month?
>
> A:  Same number, 2 million.

(*Id.*).  Given all these facts, Defendant's motion for summary judgment must be denied.  Furthermore, Plaintiff's motion for summary judgment should be granted.

Finally, Defendant relies heavily upon the inadequacy of the Expert Report of Jeffrey Hansen.  However, Plaintiff does not use Mr. Hansen's report, nor rely upon Mr. Hansen's report for purposes of this motion.  The report was disclosed pursuant Rule 26, however, expert testimony has not been offered in this matter at this time. As such, Mr. Hansen's report is not relevant for purposes of this motion.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for either party. *Id.*  The moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-24 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To that end, reasonable inferences and conclusions deriving from the stated facts must be drawn in favor of non-moving party. *Id; see also Anderson*, 477 U.S. at 255.   By these

standards, Defendant's motion for summary judgment must be denied.

## II.   OVERVIEW OF THE TCPA AND FCC ORDERS

In the early 1990's, companies were able to reach more than 18 million Americans everyday through "the advent of machines that *automatically dial a telephone number and deliver to the called party an artificial or prerecorded voice message.*" *See Marks v. Crunch San Diego, LLC*, 2018 WL 4495553, at *1-2 (9th Cir. Sept. 20, 2018) (emphasis added) (internal citations and quotations omitted). These automated telephone calls were considered a nuisance, irritation, and invasion of privacy. *See id.; see also Mims*, 132 S. Ct. at 744, 751. As a result, the TCPA was enacted to place restrictions on the use of automated telephone dialing equipment. Congress intended to regulate equipment that was "automatic," and that had "the capacity" to function in two specified ways: "to store or produce telephone numbers to be called, using a random or sequential number generator" and "to dial" those telephone numbers. *Marks*, 2018 WL 4495553, at *2.

The TCPA "prohibits calls to a person's cellular phone using an ATDS" unless such calls are made with the prior express consent of the called party. *Hashw v. Dep't Stores Nat. Bank*, 986 F. Supp. 2d 1058, 1060 (D. Minn. 2013) (citing 47 U.S.C. § 227(b)); *see also Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1038 (D. Minn. 2010), *aff'd*, 413 F. App'x 925 (8th Cir. 2011)[3].

---

[3] The statute states: "It shall be unlawful for any person . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service, . . . , or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or

9

In addition to the Congress specifically required the FCC to prescribe regulations to implement the requirements of the TCPA. *See* 47 U.S.C. § 227(b)(2). Pursuant to Congress' directive, the FCC has promulgated rules and orders interpreting the TCPA since 1992.  In 2003, the FCC exercised its rulemaking authority to address "predictive dialers," which is "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a [caller] will be available to take the call." *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Doc. No. 02-278, 18 FCC Rcd 14014, ¶ 8, n. 31 (July 3, 2003) (hereinafter "2003 TCPA Order") (emphasis added). The FCC found "that a predictive dialer falls within the meaning and statutory definition of an 'automatic telephone dialing equipment' and the intent of Congress." *Id.* at ¶ 133.

In 2008, the FCC subsequently "affirmed that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Doc. No. 02-278, Declaratory Ruling, 23 FCC Rcd 559, ¶¶ 6-14 (Jan. 4, 2008) (hereinafter "2008 TCPA Order") (confirming the 2003 TCPA Order). Both the 2003 TCPA Order and the 2008 TCPA order state, among other things, that a system that dials numbers from a list is an ATDS.  *See id.*

In 2015, the FCC issued another order attempting to clarify its position on the type

---

guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii).

of equipment that was considered an ATDS. *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Doc. No. 02-278, 30 FCC Rcd 7961, 7967, ¶ 2-4, (July 10, 2015) (hereinafter "2015 TCPA Order"); *see also ACA International*, 885 F.3d at 691.  Relevant to this matter, the 2015 TCPA Order found that: (1) the TCPA applies to any device that has the "capacity" to autodial, which encompasses the present and potential capacity; and that (2) the term "called party" refers to the "current subscriber" of the phone and that calls to a wrong person or a reassigned telephone number violate the TCPA, with the exception of a one-call safe harbor. *See ACA International*, 885 F.3d at 693-94[4].  On March 16, 2018, the D.C. Circuit set aside certain portions of the 2015 TCPA Order. *ACA International*, 885 F.3d at 695 (D.C. Cir. 2018); *see also Abante Rooter &Plumbing, Inc. v. Alarm.com, Inc.*, 2018 WL 3707283, at *6 (N.D. Cal. Aug. 3, 2018).

## II.   <u>DEFENDANT USED AN ATDS TO MAKE NON-EMERGENCY DEBT COLLECTION CALLS TO PLAINTIFF'S CELL PHONE WITHOUT PLAINTIFF'S CONSENT</u>

Plaintiff's claims in this matter arise under the TCPA, specifically under 47 U.S.C. § 227(b)(1)(A)(iii).  Therefore, Plaintiff must show that: (1) Defendant called Plaintiff's cellular phone; (2) using an ATDS; and (3) without Plaintiff's prior express consent.  *See* 47 U.S.C. S.C. § 227(b)(1)(A)(iii); *Hashw*, 986 F. Supp. 2d at 1060 (citing 47 U.S.C. § 227(b)); *see also Edeh*, 748 F. Supp. 2d at 1038.  Plaintiff is not required to prove intent because it is a strict liability statute.  *See Alea London Ltd. v. Am. Home Servs., Inc.*, 638

---

[4] The 2015 TCPA Order also addressed, (3) revocation of consent and, (4) certain health care

F.3d 768, 776 (11th Cir. 2011) ("The TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages."); *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 134 (E.D.N.Y. 2015) (same); *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 882 n. 3 (8th Cir. 2005) ("The [TCPA] makes no exception for senders who mistakenly believe that recipients' permission or invitation existed. The issue of intent, or more accurately, the issues of knowledge and willfulness, however, clearly are material to the question of treble damages.").

The crux of the parties' dispute is whether Defendant used an ATDS to place the calls at issue in this matter.  Defendant argues that *ACA International* completely erased the FCC's interpretation of an ATDS. (ECF. 87 at 12-20.) Thus, it is Defendant's position that in deciding whether the dialing systems in this matter constitute an ATDS, the Court is left with only the statutory definition of an ATDS. Although Plaintiff disagrees with Defendant's interpretation of *ACA International*, it is a distinction without a difference in this matter because the dialing systems used constitute an ATDS, even without the guidance of the FCC's interpretation.

**A.    The Statutory Definition of an ATDS is *Not* Susceptible to a Straightforward Interpretation Based on the Plain Language of The TCPA.**

To the extent the 1991 statutory text is all that remains, the Court must start fresh and consider the definition of an ATDS under the TCPA.  "As with any question of

---

exemptions, which are not at issue.  *Id.*

statutory interpretation, [the] analysis begins with the plain language of the statute."

*Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citing *Lamie v. United States Trustee*,

540 U.S. 526, 534 (2004)). When the statutory language is plain and unambiguous, we

must enforce it according to its terms. *Jimenez*, 555 U.S. at 118.  When the intent of

Congress cannot be clearly discerned from the statute, the Eight Circuit has stated that:

> If the language of a statute is ambiguous, we should consider 'the purpose, the subject matter and the condition of affairs which led to its enactment.' When the meaning of a statute is questionable, it should be given a sensible construction and construed to effectuate the underlying purposes of the law

*United States v. McAllister*, 225 F.3d 982, 986 (8th Cir. 2000) (quoting *United States v.*

*S.A.*, 129 F.3d 995, 998 (8th Cir. 1997)). "It is a fundamental canon of statutory

construction that the words of a statute must be read in their context and with a view to

their place in the overall statutory scheme." *Northshore Min. Co. v. Sec'y of Labor*, 709

F.3d 706, 710 (8th Cir. 2013) (quoting *Davis v. Michigan Dep't of the Treasury*, 489 U.S.

803, 809 (1989)). The "*statutory language cannot be construed in a vacuum*."  *Davis*,

489 U.S. at 809.  In other words, it is inappropriate to rest solely on a "hypertechnical

reading" of a certain clause when such clause is "examined in isolation," even if it may

be consistent with the language of certain provision.  *Id.*

    With that background, the Court must first look to the text of the TCPA. The

TCPA defines an ATDS as any "equipment which has the capacity – (A) to store or

produce telephone numbers to be called, using a random or sequential number generator;

and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).  Here, Defendant argues that it did

not violate the TCPA because the dialing systems used do not use random or sequential

CASE 0:16-cv-00173-PAM-ECW   Document 91   Filed 10/04/18   Page 14 of 41

number generators. (ECF. 87 at 12-20.) However, as discussed below, Plaintiff will show

that: (1) the dialing systems used in this matter constitute an ATDS because they

automatically dialed the calls, by themselves, and without any human intervention; (2)

the statutory language does not require that numbers be produced by a random or

sequential number generator; and (3) that predictive dialers and/or systems that

automatically dial numbers from list constitute an ATDS.

   The statutory language defining an ATDS is *ambiguous* on its face and not

susceptible to a straightforward interpretation.  *See Marks*, 2018 WL 4495553, at *7-8

(The Ninth Circuit struggled with the statutory language and concluded that the definition

"*is _not susceptible_ to a straightforward interpretation based on the plain language alone,

Rather the statutory text is _ambiguous on its face_.*") (emphasis added)[5].   The Ninth

Circuit in *Marks* recently framed the issue:

>   The question is whether, in order to be an ATDS, a device must dial numbers
>   generated by a random or sequential number generator or if a device can be
>   an ATDS if it merely dials numbers from a stored list. We must also
>   determine to what extent the device must function without human
>   intervention in order to qualify as an ATDS.

*Marks*, 2018 WL 4495553, at *7.

   Importantly, the D.C. Circuit in *ACA International* agreed as it explained, "[a]

basic *question raised by the statutory definition* is whether a device must itself have the

ability to generate random or sequential telephone numbers to be dialed[,]" _or_ whether it

---

[5] *See also King v. Time Warner Cable Inc*., 894 F.3d 473, 476 (2d Cir. 2018) (in light of
competing interpretations as to the meaning of the word "capacity" within the definition of an
ATDS, the court engaged in statutory interpretation and noted the ambiguous legislative history).

is "enough if the device can call from a database of telephone numbers generated elsewhere[.]" *ACA International*, 885 F.3d at 701 (emphasis added).   Although the D.C. Circuit was only deciding whether the FCC's interpretation was arbitrary and capricious, it explicitly stated, "*[i]t might be permissible*" for the FCC to adopt an interpretation that a device must generate random or sequential numbers to be an ATDS, *or* that a device could be an ATDS if it could dial numbers from a stored list.   *Id*. at 702-03 (emphasis added)[6].

Because the statutory definition of an ATDS is ambiguous on its face, the Court must look to the underlying purposes of the TCPA, the subject matter and the condition of affairs which led to its enactment of the TCPA, and the overall statutory scheme. *See McAllister*, 225 F.3d at 986; *Northshore Min. Co.*, 709 F.3d at 710; *Davis*, 489 U.S. at 809. Here, the statutory text, underlying purpose, and history of the TCPA make clear that an ATDS includes dialing equipment that dials numbers from a stored list.

### B.   The Statutory Language Does *Not* Require That Numbers Be Produced By A Random Or Sequential Generator.

The definition of an ATDS does not require that the numbers dialed be produced by a number generator, because the definition also includes equipment that stores and dials telephone numbers. To reiterate, an ATDS is any "equipment which has the capacity – (A) to store *or* produce telephone numbers to be called, using a random or

---

[6] The D.C. Circuit was **not** interpreting the TCPA, rather it was **only** deciding whether the FCC's interpretation of the TCPA was arbitrary or capricious. *ACA International*, 885 F.3d at 694-95. *See also Somogyi v. Freedom Mortg. Corp.*, No. 17-cv-6546 (JBS/JS), 2018 WL 3656158, at *4 (D.N.J. Aug. 2, 2018) ("the statutory definition of an ATDS (as opposed to the FCC's

sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

The definition of an ATDS cannot be interpreted to require that the numbers dialed be produced by a random or sequential number generator. To do so ignores the word "*store*" in the statute, and renders several statutory provisions superfluous or nonsensical. Specifically, the definition includes the disjunctive "*or*" – meaning that an ATDS *must* include the systems that *store* telephone numbers, *regardless* of whether it *produced* the numbers. *See Bourff v. Rubin Lublin*, L.L.C., 674 F.3d 1238, 1241 (11th Cir. 2016) (explaining "or" in a similarly worded consumer protection statute). The phrase "using a random or sequential number generator" must modify "produce" because numbers *cannot* be *stored* using a random or sequential number *generator*[7]. It also avoids a nonsensical reading of the word "store" and gives *meaning to all words* in the definition, and the statutory scheme as a whole. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (statutes are to be construed so that, "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

Most importantly, when reading the statutory text as whole, *as opposed to merely reviewing the ATDS in a vacuum*, it would be *impossible* to comply with the TCPA if callers were *not* using the dialing equipment to call from a stored database of inputted numbers. Therefore, text of the TCPA "*indicates that equipment that made automatic calls from lists of recipients was also covered by the TCPA.*" *Marks*, 2018 WL 4495553,

---

interpretation of an ATDS) was not questioned in either *ACA International* or *Dominguez*.").

[7] This interpretation conforms to the Last Antecedent Rule, under which a limiting clause "should ordinarily be read as modifying only the noun or phrase that it immediately follows."

at *8 (emphasis added).

To be sure, additional provisions of the TCPA:

- Allow autodialed calls to be made to a party who has consented. 47 U.S.C. § 227(b)(1)(A)(iii);

- Allow calls made "solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii);

- Prohibit use of an ATDS in a way that ties up multiple lines of a multi-line business. 47 U.S.C. § 227(b)(1)(D);

- Prohibit calls to emergency telephone lines. 47 U.S.C. § 227(b)(1)(A)(i);

- Prohibit calls to patient rooms in hospitals or other health care facilities. 47 U.S.C. § 227(b)(1)(A)(ii); and

- Prohibits calls to cell phones § 227(b)(1)(A)(iii).

*See also Marks*, 2018 WL 4495553, at *7.  To adopt the interpretation that an ATDS must *only* dial telephone numbers randomly or sequentially produced *out of thin air*, would make it *impossible* for any company to know whether it was calling a cell phone, an emergency line, a patient in a hospital, a business line, a person who owes a debt to the U.S., or a person who had provided express consent. Restated, this reading would mean that *only as a matter of sheer* <u>coincidence</u> would callers ever have consent to autodial numbers, *if ever at all*.

In other words, to use an ATDS to call consumers that had provided consent to be called, Defendant "<u>*would have to dial from a list of phone numbers*</u> of persons who had consented to such calls, <u>*rather than merely dialing a block of random or sequential*</u>

---

*Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).

*numbers.*" *Marks*, 2018 WL 4495553, at \*7 (citing 47 U.S.C. § 227(b)(1)(A)). The court

in *Marks* further found:

> In order to comply with such restrictions, an ATDS could either dial a list of permitted numbers (as allowed for autodialed calls made with the prior express consent of the called party) or block prohibited numbers when calling a sequence of random or sequential numbers. *In either case, these provisions indicate Congress's understanding that an ATDS was <u>not</u> limited to dialing wholly random or sequential blocks of numbers, but could be configured to <u>dial a curated list</u>.*

*Id*, 2018 WL 4495553, at \*8, n.7. (emphasis added).  Indeed, when looking back at the

lay of the land in 1990, *before the enactment of the TCPA*, a caller could use a machine to

randomly generate numbers out of thin air because there were no restrictions on which

numbers could or could not be called.  Conversely, given the restrictions on the use of an

ATDS *after the TCPA was enacted*, it is impossible for a caller to <u>*not*</u> use a list of

numbers of some (i.e., a list that excludes emergency numbers, a list only includes callers

who provided consent, etc.).  Therefore, the definition of an ATDS <u>*must*</u> include dialing

from a list in order to take advantage of the permitted uses for placing calls with an

ATDS.

      In addition, in 2015 Congress amended the TCPA to exclude calls made "solely to

collect a debt owed to or guaranteed by the United States." *Marks*, 2018 WL 4495553, at

\*8 (citing *Bipartisan Budget Act of 2015*, 129 Stat. 584, 588 (codified at 47 U.S.C. §

227(b)(1)(A)(iii)).  Despite the FCC prior orders interpreting an ATDS to include dialers

that dial from a stored list – not to mention the wealth of case law – Congress left the

definition of an ATDS untouched. *Id.* Notably, Congress did not express any

disagreement with the subsequent interpretation of an ATDS. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1111 (8th Cir. 2016); *see also Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988) (Congress is presumed to have knowledge about existing law pertinent to the legislation it enacts); *Johnson v. First Nat. Bank of Montevideo, Minn.*, 719 F.2d 270, 277 (8th Cir. 1983) (courts assume that "Congress acts with knowledge of existing law" and "absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction.").

In this case, "[b]ecause we infer that Congress was aware of the existing definition of ATDS, its decision not to amend the statutory definition of ATDS to overrule the FCC's interpretation suggests Congress gave the interpretation its tacit approval." *Marks*, 2018 WL 4495553, at *9. Ultimately, Ninth Circuit in *Marks* concluded:

> that the statutory definition of ATDS is *not* limited to devices with the capacity to call numbers produced by a "random or sequential number generator," but also *includes* devices with the capacity *to dial stored numbers automatically*. Accordingly, we read § 227(a)(1) to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers.

*Id*. (emphasis added).  This Court should follow the reasoning in *Marks*.

This Court should be reminded, and it is important to note, that when interpreting definition of an ATDS, that the TCPA is to be interpreted in accordance with the *broad,*

*remedial objectives of the TCPA. Wright v. Target Corporation*, 2015 WL 8751582, at *7

(D. Minn. Dec. 14, 2015). In interpreting whether a consumer had a right to revoke

consent, the District of Minnesota found:

> The TCPA is a *remedial statute* that was passed to *protect consumers from unwanted automated telephone calls*. Because the TCPA is a remedial statute, it should be *construed to benefit consumers*. As a result, we should interpret *in [the plaintiff's] favor* any silence in the TCPA as to a revocation right.

*Id.* (citations omitted). Therefore, in accordance with the broad remedial objective of the

TCPA, an ATDS must be construed as equipment which has the capacity: (1) to store

numbers to be called; or (2) to produce numbers to be called, using a random or

sequential number generator—and to dial such numbers.

However, even if this court concludes that the words "using a random or

sequential number generator" modify both "store" and "produce," at the very least it

should adopt a liberal construction of the term "*sequential*" in light of the TCPA's

remedial purpose. As *ACA International* notes: "Anytime phone numbers are dialed from

a set list, the database of numbers must be called in *some* order—either in a random or

some other sequence." 885 F.3d at 702 (ital. in original and underline added). Thus,

"*sequential*" simply means that numbers are dialed pursuant to an order chosen by the

dialing system. With this interpretation of "sequential," a system that dials numbers from

a stored list in a sequence it selects is an ATDS.  For the reasons mentioned, and to be

discussed below, the dialing systems used by Defendant were in fact an ATDS.

Therefore, Defendant's motion must be denied, and Plaintiff's motion must be granted.

### C.    This Court Should Follow The Reasoning in Marks, as Opposed to The Flawed Reasoning in *Dominguez*.

Here, Defendant relies upon *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 120 (3rd Cir. 2018) to support its arguments. (ECF. 87 at 15, 17, 20.) However, the reasoning in *Dominguez* is equally as unreasonable for the same reasons *ACA International* found the 2015 TCPA Order to be unreasonable.   The D.C. Circuit set aside the 2015 TCPA Order because it unreasonably adopted two competing positions – i.e., that an ATDS: (1) must have the ability to randomly generate numbers; *but also* (2) may lack the ability to do so.  *ACA International*, 885 F.3d at 702-03 (noting that the FCC was unclear). The D.C. Circuit added, "*[i]t might be permissible*" for the FCC to adopt either interpretation, but cannot reasonably "espouse both competing interpretations in the same order." *Id.* (emphasis added).

*Dominguez*, without any reasoning, held that an ATDS must use a random or sequential number generator. 894 F.3d at 119-21. However, in an earlier opinion, the Third Circuit in *Dominguez*, viewed the definition of an ATDS as ambiguous by acknowledging, "*that it is unclear how a number can be stored (as opposed to produced) using a 'random or sequential number generator.*'" *Dominguez v. Yahoo, Inc.,* 629 F. App'x 369, 372 n.1 (3rd Cir. 2015) (emphasis added).   Just as the D.C. Circuit had rejected the FCC's two competing interpretations of an ATDS in the same order, this court should reject the Third Circuit's two competing interpretations of an ATDS in the same case.   The court in *Marks* expressly rejected "the Third Circuit's *unreasoned assumption* that a device must be able to generate random or sequential numbers in order

to qualify as an ATDS." *Marks*, 2018 WL 4495553, at *9 (citing *Dominguez*, 894 F.3d at 120). Specifically, the court in *Marks* took issue with the fact that the Third Circuit completely ignored the statutory interpretation question that arise from the definition of an ATDS, despite acknowledging its existence. *Id.* The reasoning in *Marks* is both correct and highly persuasive, and the Court should follow *Marks* as opposed to *Dominguez*.

The mere fact that the machine dials numbers from a list does not remove the dialing systems at issue from constituting an ATDS. In addition, it is clear that Congress sought to prohibit equipment that could autodial, as opposed machines that lacked any human oversight whatsoever. Undoubtedly, any machine requires some human intervention, however small, before it performs an automatic function (i.e., providing an ATDS with a list of phone numbers). *See ACA* International, 885 F.3d at 703 ("auto" in the words autodialer or the phrase automatic dialing would "*seem to envision non-manual dialing of telephone numbers*.") (emphasis added). Therefore, providing a list of numbers is not the type of human intervention the TCPA sought to prevent. Given the history of the TCPA and the definition of an ATDS, the aQrate dialing system and the Aspect Unified dialing system constitute an ATDS. At the very least, there are genuine issues of material fact as to whether the Defendant's dialing systems constitute an ATDS because the evidence in the record shows that Defendant's dialing systems store numbers and dial the numbers automatically as part of scheduled campaigns. More appropriately, the evidence shows that the dialing systems automatically dialed Plaintiff's cell phone

without any human intervention whatsoever.

**D.    ACA International Did Not Vacate The TCPA Orders From 2003 and 2008.**

The decision in *ACA International* is largely irrelevant because the D.C. Circuit only considered challenges to the 2015 TCPA Order. *See ACA International*, 885 F.3d at 694 (The D.C. Circuit took up challenges to "*the Commission's 2015 ruling*" and assessed whether the FCC actions "*in its 2015 order*" were arbitrary and capricious") (emphasis added)[8]; *see also Dominguez*, 894 F.3d at 119 (*ACA International* aside the 2015 Order); *King*, 894 F.3d at 476.   Because the only matter before the court was the 2015 TCPA Order, *ACA International* simply set aside certain portions of the 2015 TCPA Order, and nothing else. *See ACA International*, 885 F.3d at 694-95, 701-03[9].

Here, Defendant argues that *ACA International* set aside the FCC's 2003 and 2008 TCPA Order. (ECF. 87 at 13-15, 18-19.) (citing *ACA International*, 885 F.3d at 701). But that is not true.   The question before the D.C. Circuit was whether the court had jurisdiction to hear challenges to *the 2015 TCPA Order* in light of the FCC's previous Orders in 2003 and 2008, the question was *not* jurisdiction to challenge previous orders. *ACA International*, 885 F.3d at 701.   As Defendant correctly pointed out, the D.C. Circuit stated that it *disagreed* with the argument that "because there was no timely appeal from

---

[8] *See also id* at 691, 695 and 693.

[9] The procedural mechanism to challenge the FCC's rule-making mandate under the TCPA is the Hobbs Act (*i.e., under 28 U.S.C. § 2342*), and it must be filed within 60 days.  *See Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1315 (S.D. Fla. 2018); *see also 28 U.S.C. § 2344.*   Thus, as a practical matter, the D.C. Circuit could not have vacated the TCPA Orders from 2003 and 2008 because the time to do so had long since passed.   The reviewing court only has authority "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" final FCC

[the 2003 and 2008 TCPA Orders], it is too late now to raise a challenge by seeking *review of a more recent declaratory ruling* that essentially ratifies the previous ones." *Id.* (emphasis added).  The FCC was *only* arguing that <u>the portion</u> of the 2015 TCPA Order which addressed the definition of an ATDS was not reviewable, simply because it reiterated questions that had previously been resolved. *Id.* Likewise, the D.C. Circuit correctly disagreed.  The issue was <u>never</u> jurisdiction to review the previous orders.  *Id.*

The only open issues addressed in the 2015 TCPA Order relating to the definition of an ATDS, were those issues relating present capacity or future capability. *See ACA International*, 885 F.3d at 695, 701-03.  For example, the court held that the FCC's "*prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform*" which is why petitioners sought: (1) a declaratory ruling; and (2) a rulemaking.  *Id.*  The court held, "<u>*[t]he ruling*</u> is thus reviewable on both grounds." *Id.* at 701 (citing to the "*2015 Declaratory Ruling*").  *Nothing* in the court's opinion supports the view that the D.C. Circuit intended to overturn the FCC's 2003 and 2008 orders, or that it possibly could have done so.  The D.C. Circuit ultimately concluded that "*[t]he 2015 ruling*" was so unclear that it did not satisfy the requirement of reasoned decision making.  *ACA International*, 885 F.3d at 703 (emphasis added).  Importantly, this case does <u>not</u> involve the potential capacity for Defendant's dialing system to act as an ATDS; Defendant's dialing systems demonstrably have the current capacity to act as an ATDS. As such, the *ACA International* decision has zero import to this action.

---

orders.  28 U.S.C. § 2342.

**E.     TCPA Decisions post-*ACA International* Support Plaintiff's Position.**

A number of courts have already had the opportunity to issue extensive analysis of

the impact of the decision in *ACA International*.  For example, the following courts found

that *ACA International* applied to the 2015 TCPA Order, and not the previous orders[10]:

- *Reyes*, 312 F. Supp. 3d at 1315;

- *Swaney v. Regions Bank*, 2018 WL 2316452, *1 (N.D. Ala. May 22, 2018);

- *McMillion v. Rash Curtis & Associates*, 2018 WL 3023449, at *3 (N.D. Cal. Jun. 18, 2018);

- *Maddox v. CBE Group, Inc*., 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018).

- *Ammons v. Ally Financial, Inc.*, 2018 WL 3134619,*6 (M.D. Tenn. Jun 27, 2018);

- *Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at *3 (N.D. Cal. Jul 2, 2018);

- *O'Shea v. Am. Solar Sol., Inc.*, 2018 WL 3217735, at *2 (S.D. Cal. Jul 2, 2018);

- *Glasser, et. al. v. Hilton Grand Vacations Co., LLC*., 2018 WL 4565751, at *4 (M.D. Fla. Sep. 24, 2018);

- *Somogyi*, 2018 WL 3656158, *5;

- *Sieleman* v. *Freedom Mortgage Corporation,* 2018 WL 3656159, at *3 (D.N.J. Aug. 2, 2018); and

- *Ramos v. Hopele of Fort Lauderdale, LLC*, 2018 WL 4568428, at *2 (S.D. Fla. Sep. 20, 2018); and

- *Abante Rooter and Plumbing, Inc.*, 2018 WL 3707283, at*6-7.

---

[10] Although less explicit than the cases identified above, both *King*, 894 F.3d at 476 and *Dominguez*, at 894 F.3d at 120, seem to suggest that *ACA International* <u>only</u> set aside the 2015 TCPA Order. To be sure, *see also Somogyi*, 2018 WL 3656158, *4, n.4 (citing *Dominguez*, 894 F.2d. at 119) (the majority focused on the present capacity and "the [Third Circuit] indicated that the 2003 FCC Order was not overruled"); *Sieleman*, 2018 WL 3656159, at *3 (same).

25

Therefore, Plaintiff is not alone in his position concerning the effect of *ACA International* on previous TCPA Orders[11]. This Court should follow the persuasive reasoning from the court's identified above.

The parties made similar arguments in *Heard v. Nationstar Mortgage LLC*, 2018 WL 4028116, at \*4-6 (N.D. Ala. Aug. 23, 2018). The plaintiff argued that the dialing system dials call without any human interventions, from information stored in the dialer, input by the defendant, is a predictive dialer, and is an ATDS post-*ACA International*. *Id.* The dialer dials numbers similar to how Defendant testified in this matter (*i.e., machine dial the number, predicts when to transfer to a live agent, from information input into system by Defendant, and automatically*). *Id.* The information is uploaded for predictive dialing daily. *Id.* "The court held that "Nationstar's system had the capacity to "store" caller information within the meaning of the TCPA." *Id.* at 5. The court ultimately concluded that the system was an ATDS and "Nationstar's predictive calls violated the TCPA." *Id.* at 7. This Court should follow suit.

Here, Defendant relies on *Herrick v. GoDaddy, LLC*, 312 F. Supp. 3d 792 (D. Ariz. May 14, 2018). *Herrick* involved mass advertising text messages being sent to consumers, and did not involve the use of a predictive dialer. *Id.* at 793. In rejecting

---

[11] On flip-side, as Defendant points out in its brief, there are a number of cases that have found *ACA International* vacated the entire history of the FCC's ruling concerning the definition of an ATDS. *See Pinkus v. Sirius XM Radio, Inc.*, 2018 WL 3586186, \*8 (N.D. Ill. Jul 26, 2018); *Keyes v. Ocwen Loan Servicing, LLC*, 2018 WL 3914707, \*6 (S.D. Mich. Aug16, 2018), *appeal filed* No. 18-1989 (6th Cir 2018); *Marshall v. The CBE Group, Inc.*, 2018 WL 1567852, at \*7 (D. Nev. Mar 30, 2018); *Herrick v. GoDaddy.com LLC*, 312 F.Supp.3d 792, \*8 (D. Az. May 14, 2018) *appeal filed* No. 18-16048 (9th Cir. 2018).

*Herrick*, the court in *Ammons* stated:

> *Herrick* is internally inconsistent. After disavowing the FCC's 2015
> guidance regarding the definition of an ATDS, the court engages in the
> very analysis that the FCC suggested in the 2015 FCC Order—eventually
> concluding that the dialer at issue "lacked the capacity to become a device
> that could randomly or sequentially generate numbers to be dialed." *Id.*
> (emphasis added). Finally, the *Herrick* decision really rests on the issue of
> "human intervention." Curiously, regarding human intervention, the
> decision found that the FCC's prior pronouncements were still helpful and
> applied them. Be that as it may, human intervention is what truly doomed
> the *Herrick* plaintiff, because the defendant's dialer required such a level of
> human agency that it was completely disqualifying. *Id.* at *10.

*Ammons*, 2018 WL 3134619, at *6. As identified in the facts and discussed below, the

systems in this case *automatically dialed* Plaintiff's cellphone. Therefore, *Herrick* is not

relevant to this matter.

Defendant also cites to *Marshall v. CBE Grp., Inc.*, 2018 WL 1567852, at *7 (D.

Nev. Mar. 30, 2018). *Marshall* involved a completely different dialing system, wherein a

human was required to click on a number each time to place a call, not a machine that

automatically dials. *Id.* at *5. In rejecting *Marshall*, the court in *Reyes* stated:

> The plaintiff then argued "that notwithstanding the *ACA Int'l* ruling, the
> 2015 FCC Order, as well as the 2003 FCC Order, remains binding on this
> Court." *Id.* The *Marshall* Court, however, skirted that argument, reasoning
> instead that "[e]ven assuming, arguendo, that Plaintiff is correct, these
> interpretations have repeatedly emphasized the significance of the 'human
> intervention' element to the ATDS analysis." *Id.* And on that front, the
> *Marshall* Court found "that the overwhelming weight of authority applying
> this element hold that 'point-and-click' dialing systems, paired with a cloud-
> based pass-through services, do not constitute an ATDS as a matter of law in
> light of the clicker agent's human intervention." *Id.* (citing, inter alia,
> *Strauss*, 173 F.Supp.3d at 1310–11).

*Reyes*, 312 F. Supp. 3d at 1319. Like reasoning for rejecting *Herrick*, the systems in this

case *automatically dialed* Plaintiff's cellphone.   Therefore, *Marshall* is not relevant to this matter.

Defendant also cites *Dominguez*, 894 F.3d at 119. Like *Herrick*, *Dominguez* involved mass text messages and had absolutely nothing to do with predictive dialers. 894 F.3d at 119.  Not to mention, courts within the Third Circuit interpret *Dominguez* as mean that previous FCC orders concerning predictive dialers remain good law.  *See Somogyi*, 2018 WL 3656158, *4 (As to the law regarding predictive dialers, the Third Circuit stated, "[t]he 2003 Order remains effective guidance, according to the Third Circuit in *Dominguez*, 893 F.2d at 119."); *Sieleman*, 2018 WL 3656159, at *3 ("[defendant] argues the D.C. Circuit's criticism of the 2003 Order amounts to *ACA International* implicitly overruling the portions of those FCC Orders that held "predictive dialers" to qualify as ATDSs. [Docket Item 14 at 4.] As the Third Circuit recently observed, however, that may not be so. *See Dominguez v. Yahoo, Inc*., 894 F.3d 116 (3d Cir. June 26, 2018).")

Defendant also relies on *King v. Time Warner*.  The Second Circuit's decision was expressly limited to the issue of "capacity" *King*, 894 F.3d at 481. The Second Circuit remanded to the district court to resolve further issues raised by the parties.  *Id.*  First, the district court in *King* did not address the random or sequential number generator issues because it found the issue irrelevant.  *Id*[12].  Second, *King* made "no opinion on whether

---

[12] The Second Circuit noted that the role of the phrase, "using a random or sequential number generator," has generated substantial questions over the years.  *Id.*(quoting *ACA International*, 885 F.3d at 701).

that lack of human involvement is a consideration relevant to King's claims." *Id.* The Second Circuit finally added:

> In light of the technological complexities inherent in the application of the statute to different types of devices, software programs, and "systems," and the lack of clarity in the record . . . it seems prudent to *limit* our pronouncements in this case . . . . when we consider the meaning of the statute independently, without an administrative interpretation to defer to, the best interpretation of the statutory language is the one suggested by the D.C. Circuit's discussion in *ACA International*: in the TCPA's definition of an autodialer, a device's "*capacity*" refers to its current functions absent additional modifications, regardless of whether those functions were in use during the offending call.

*Id.* 481–82. (emphasis added).

The rational for authority cited by Defendant is unreasoned and not well taken, when considering the weight of contrary authority. The decision in *ACA International* was much more limiting. Ultimately, the dialing systems at issue remain an ATDS with or without *ACA International* or the FCC Orders. Therefore, Defendant's motion must be denied. Conversely, Plaintiff's motion must be granted.

### F.   Defendant Violated the TCPA.

In this case, the evidence shows that Defendant violated the TCPA because: (1) Defendant called Plaintiff's cellular phone; (2) using an ATDS; and (3) without Plaintiff's prior express consent. Before addressing the facts, there are two brief legal issues address.

The first issues, prior express consent. The definition of "called party" was defined through courts, *not the FCC*, long *before* the 2015 TCPA Order. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640, 643 (7th Cir. 2012). Both the Seventh Circuit and

the Eleventh Circuit held that "called party" refers to the "subscriber and customary user" of the phone, and both rejected the argument that called party stands for the "intended recipient." *See Soppet*, 679 F.3d at 643; *Osorio*, 746 F.3d at 1252. The D.C. Circuit also concluded that "'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made, not the previous subscriber who had given consent." *ACA International*, 885 F.3d at 706 (citing *Soppet*, 679 F.3d at 643; and *Osorio*, 746 F.3d at 1252) (internal quotations omitted).   Since the courts had decided this issue without any reliance on the FCC's interpretation and before the FCC had even decided, reliance on an FCC's interpretation is unnecessary.   If anything, *ACA International* strengthens the conclusion that consent must be provided by the person whose phone was actually called.   With regard to reassigned numbers, the law is the same as it was prior to the FCC's order.   Both District Courts and Circuit Courts found TCPA liability for calls to the wrong person with reassigned numbers from a previous person who had provided consent. In this case, Plaintiff is the "called party" and therefore, Defendant needs Plaintiff's consent to call his cell phone using an ATDS.

The second issue is liability under the TCPA as a result of debt collection telephone calls placed on Defendant's behalf. Defendant is liable for the automated telephone calls First Contact and iEnergizer made to Plaintiff, on behalf of Defendant, in Defendant's name, and for the purposes of debt collection.   *See 2008 TCPA Order,* ("[A] creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed

by a third-party collector on behalf of that creditor are treated as if the creditor itself placed the call.")[13]. Accordingly, Defendant is liable for the debt collection calls made by its vendors to Plaintiff.

With those two legal issues out of the way, the Court should look to the follow facts, which are not in dispute:

- From May 2015 through at least July 25, 2016 Plaintiff's cellular service provider was Straight Talk Wireless;

- From May 2015 through at least July 25, 2016, the phone number associated with Plaintiff's Straight Talk Wireless cell phone was the 4660 Number;

- Plaintiff was the owner, subscriber, or customer of the 4660 Number, which is cell phone;

- Between September 24, 2015 through December 16, 2015, Defendant placed approximately 140 telephone calls to the 4660 Number;

- Defendant was attempting to call a third-party, someone other than Plaintiff, in connection with the collection of a credit card debt when calling the 4660 Number;

- Defendant was not calling for emergency purposes;

- *Plaintiff* never provided Defendant with consent to call his cell phone[14];

- Plaintiff had no relationship with Defendant and was not Defendant's customer;

- Defendant contracted with First Contact and iEnergizer to perform credit card account collection services on behalf of Defendant, and to secure payments on

---

[13] Even though the parties dispute the effect of *ACA International* on previous FCC orders, there is no dispute that it had no effect whatsoever on any issue other than the four issues challenged in *ACA International*. *See ACA International* 885 F.3d at 693-94 (Petitioners only challenged (1) the definition of an ATDS and its capacity; (2) the term "called party" and the safe-harbor for reassigned telephone numbers; (3) revocation of consent; and (4) health care exemptions).

[14] Defendant argues only that it had consent to call "R.B.", the person whom Defendant was attempting to reach by calling the 4660 Number.

past due accounts;

- At all times in this matter, First Contact and iEnergizer, on behalf of Defendant, placed the telephone calls to Plaintiff's Cell Phone and identified themselves as "Credit One Bank.": and

- Defendant provides these vendors with customer information, including phone numbers, and directs them to call those numbers.

Because there is no dispute that First Contact and iEnergizer made the debt collection calls, on behalf of Defendant, at Defendant's directive, and used Defendant's name, it is treated as though Defendant actually made the calls. Defendant is therefore liable for any violations of the TCPA committed by these dialer vendors at its behest. In addition, because Defendant (*i.e., through First Contact and iEnergizer*) made non-emergency debt collection calls to Plaintiff's Cell Phone, without Plaintiff's consent, Defendant is liable for violating the TCPA provided that the telephone calls were made using an ATDS.   As such, the only other issue necessary for liability is whether Defendant used an ATDS to make the calls.

### G.   Both the aQrate Dialing System and the Aspect Unified IP Dialing System Are Automatic Telephone Dialing Systems.

Defendant has admitted to using an ATDS despite any argument to the contrary. The following facts are not in dispute:

- The telephone calls were placed, almost every single day, up to 65 times in one week, and up to 10 times in one day;

- When calling Plaintiff, First Contact used only one dialing system, the aQrate dialing system;

- When calling Plaintiff, iEnergizer used one dialing system, the Aspect Unified IP dialing system;

- Each dialing system used to place the calls to Plaintiff (i.e., Aspect Unified IP and aQrate), "places the calls and screens the calls prior to send live voices to a collection agent.";

- Based on Mr. Harwood's understanding, Aspect Unified IP and aQrate are predictive dialers[15];

- In Mr. Harwood's understanding, a predictive dialer takes "the account information" and "phone numbers" provided by Defendant and "predict[s] how many phone calls to place once an agent becomes available to provide a live voice on the other end of that agent."

- Aspect Unified IP "*makes the phone calls for the agent.*" (*Id.*, p. 86.);

Furthermore, according to Defendant, the the telephone calls to Plaintiff were dialed one of three ways: (1) either dialed manually, (2) with the aQrate dialing system, or (3) with the iEnergizer dialing system.  The Call Logs identify 142 calls to Plaintiff's Cell Phone. (Strauss Decl., Ex. 3.) Out of the 142 call identified in the Call Logs, only two of the calls are identified in the Account Notes. (*Id.*, Ex. 9.) (*See* Account Notes, showing only two allegedly manual dialed Telephone Calls *September 30, 3015 at 10:29 a.m. and October 31, 2015 at 10:38 a.m.*) Again, if a Telephone Call is reflected on the Call Logs, *but it is not reflected on the Account Notes*, that indicates the Telephone Call was made <u>without an agent</u> – i.e., "an "<u>agent-less phone call.</u>" (Strauss Decl., Ex. 4 at 95-96.) Therefore, Defendants placed 140 calls to Plaintiff's "<u>without an agent</u>".

In fact, a human is <u>not</u> involved in the call until <u>after</u> consumer answers, which is

---

[15] Again, Mr. Harwood, the Vice President of Portfolio Services for Defendant, has been in the collections industry for over twenty years, he has been with Defendant since 1996.  Mr. Harwood is certified and has *training regarding dialing systems*. (Strauss Decl. Ex. 4 at 108.). Based on Mr. Harwood understanding, both the aQrate and Aspect Unified IP dialing systems are

obviously <u>after the call is dialed</u>. Both Aspect Unified IP and aQrate <u>call and dial the numbers</u>, and "when [each dialing system] detects a live voice, it will transfer to an agent." (Strauss Decl., Ex. 4 at 142) (emphasis added). The dialing systems call from the account information provided by Defendant.  A telephone call placed within aQrate and iEnergizer are <u>*not*</u> worked by a collection or customer care agent <u>*nor*</u> passed to an agent. (*Id*. at 95.)  If a telephone call is not placed through the dialing systems, the only other option is that the telephone call can be placed <u>*manually*</u> "in the same manner" that any person at home makes a call, and those calls are not placed through dialing systems.  (*Id.* at 86-87, 90-96.)

Based on the record, Defendant made 140 automatic telephone calls to Plaintiff's cellphone, without his consent, and for non-emergency debt collection purposes. Therefore, Defendant is liable for violating the TCPA.

### H.    Defendant Willfully and Knowingly Violated the TCPA.

As previously mentioned, the TCPA is a strict liability statute. No intent need be shown to establish a violation. The TCPA provides a private right of action and permits a successful Plaintiff to recover $500.00 in damages for each such violation 47 U.S.C. § 227(b)(3)(B); *see also Mims*, 132 S. Ct. at 740. The award of $500.00 per phone call is the statutory mandatory floor.  *See Charvat v. NMP, LLC,* 2012 WL 4482945, at *3 (S.D. Oh. Sep. 27, 2012). Additionally, Plaintiff is entitled to up to $1,500.00 for each time Defendant willfully or knowingly violated the TCPA.  47 U.S.C. § 227(b)(3)(C).

---

predictive dialers.

There is no dispute that there were 140 calls in violation of the TCPA. However, this is not an accident, and these were willful violations of the TCPA. Defendant's arguments concerning willful violations of the TCPA, *ignores Minnesota precedent*. The District of Minnesota has plainly held that willfully only requires that the act be intentional, as opposed to inadvertent, and not that Defendant must have known it would violate the statute. *Hashw*, 986 F. Supp. 2d 1058 at 1062. The Court in *Hashw* stated:

> Defendants argue that in order to plead willfulness, Hashw must allege facts suggesting Defendants knew or had reason to know their conduct violated the TCPA. (Def. Mem. at 10 (citing cases).) Some courts, however, have held that "knowledge of the law is unnecessary" and that a plaintiff must only plead the defendant "willfully ... ma[de] the ATDS calls." *Stewart v. Regent Asset Mgmt. Solutions, Inc.*, No. 1:10–cv2552, 2011 WL 1766018, at *6–7 (N.D. Ga. May 4, 2011) (emphasis added) (Report & Recommendation of King, M.J.), *adopted*, No. 1:10–cv–2552, slip op. at 1 (N.D. Ga. May 31, 2011); *accord, e.g., Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *7 (N.D. Ill. Mar. 19, 2013) ("[T]he Court adopts the more common interpretation that 'willfully' ... simply requires that the act be intentional or volitional, as opposed to inadvertent, and not that defendant must have known that the conduct would violate the statute."). *The undersigned agrees with this reasoning*.

*Id.* at 1062 (emphasis added); *see also e.g.*, *Lee v. Loandepot.com, LLC*, 2016 WL 4382786, *8 (D. Kan. 2016) ("to establish a knowing violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of the law."); *Stewart v. Regent Asset Mgmt. Solutions, Inc.*, 2011 WL 1766018, at *6-7 (N.D. Ga. May 4, 2011) (same); *In re Dynasty Mortg., LLC*, 22 F.C.C. Rcd. 9453, 9470 n.86 (May 14, 2007) (citing to 47 U.S.C. § 312(f)); *Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 226 (D. Mass. Jun.

35

27, 2014) ("Most courts have interpreted the willful or knowing standard to require only that a party's actions were intentional, not that it was aware that it was violating the statute."). The court in *Sengenberger v. Credit Control Servs., Inc.,* stated

> Although neither the TCPA nor the FCC regulations define the terms "willfully or knowingly", courts have generally interpreted willfulness to imply only that an action was intentional. *Smith v. Wade*, 461 U.S. 30, 41 n. 8, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). While the TCPA does not define willful, the Communications Act of 1943, of which the TCPA is a part, defines willful as "the conscious or deliberate commission or omission of such act, *irrespective of any intent to violate any provision[ ], rule or regulation*.

2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010), *adhered to on reconsideration*, 2010 WL 6373008 (N.D. Ill. June 17, 2010) (emphasis added). Therefore, Plaintiff "must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of the law." *Stewart*, 2011 WL 1766018 at *7 (quoting *Charvat v. Ryan*, 879 N.E.2d 765, 770 (Ohio 2007)).

Plaintiff requests that the Court deem the Defendant's violations to be "willful or knowing" as a matter of law based upon the uncontroverted facts before this Court.  In doing so, the Court should consider the following facts.

First, Defendant has been getting sued for violating the TCPA since at least 2012, so there is no question it knew about the TCPA, about its potential liability for violations, and about its need for compliance. For at least four years before this lawsuit was filed, Defendant was obviously aware that it was illegal to use their auto-dialer to call cell phones without prior express consent.  The following is a small sampling of just some of

36

the consumer TCPA lawsuits that Defendant has faced over the past five years in federal court[16]:

- *Montgomery v. Credit One Bank, NA*, 848 F.Supp.2d 601 (S.D.W.Va. 2012);

- *Salerno v. Credit One Bank, NA*, 2015 WL 6554977 (W.D.N.Y. 2015);

- *Carr v. Credit One Bank*, 2015 WL 9077314 (S.D.N.Y. 2015);

- *Kristensen v. Credit One Bank, N.C.*, 2015 WL 2151751 (C.D. Cal. 2015);

- *Boule v. Credit One Bank*, 2016 WL 3015251 (S.D.N.Y. 2016);

- *Laudano v. Credit One Bank*, 2016 WL 3450817 (D.N.J. 2016);

- *Ellin v. Credit One Bank*, 2015 WL 7069660 (D.N.J. 2015);

- *Potts v. Credit One Financial d/b/a Credit One Bank*, 2016 WL 225678 (M.D. Pa. 2016);

- *Bibee v. Credit One Bank*, 2015 WL 5178700 (M.D. Tenn. 2015);

- *Buonocore v. Credit One Bank, N.A.*, 2014 WL 6620623 (M.D. Ga. 2014);

- *Rajput v. Credit One Financial*, 2015 WL 8012938 (M.D. Pa. 2015);

- *Beattie v. Credit One Bank*, 2016 WL 4203511 (N.D.N.Y. 2016);

- *Griffin v. Credit One Financial*, 2015 WL 6550618 (E.D.Pa. 2015);

- *Reaser v. Credit One Financial*, 2016 WL 245541 (M.D.Pa. 2016);

- *Sexton v. Credit One Bank*, 2016 WL 6662423 (W.D.Tex. 2016);

- *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054 (7th Cir. 2018)

---

[16] In fact, according to PACER.gov, Credit One Bank is a named defendant in hundreds of federal lawsuits in this over three years. Many of these lawsuits involve allegations that Defendant violated the TCPA.

Accordingly, there is no question Defendant knew about the TCPA, their potential liability for and their need for compliance with it. Defendant knew or should have known that what they were doing violated the law without that prior express consent, and that these calls were made willfully.

Second, the sheer volume of calls, combined with this context, clearly evidences "willful and knowing" misuse of the dialing system. No human being was involved in determining whether to actually dial the calls. *If a human being had actually dialed each of the 140 calls to the wrong person, perhaps someone would have thought better of continuing to call*. Defendant purposefully removed this human element, _ostensibly to increase its efficiency and profits_.  As one District court recently held in a TCPA

> The recurring theme in [the defendant]'s briefs is that it is an unwitting victim of an unpredictable statute which was not intended to turn "what most people think of as an innocuous call to a wrong number" into large damages awards. . . . But the statute is not unpredictable; companies like [the defendant] are on clear notice that autodialing phones is prohibited by default. If a business wishes to contract around that rule with its customers, it may, but the risk of error falls on the caller, so it should take care to ensure that it is calling the right people with information they actually want to receive. A responsible business in [the defendant]'s position might have dispatched a live agent to reach out to [actual debtor] after the IVR failed to reach him the first several times. Whether the agent's call were answered by Ms. King or her voicemail, the agent would quickly realize the mistake and fix the company's records so that the machine would not contact her anymore. The responsible company will reduce its exposure dramatically by taking proactive steps to mitigate damages, while its competitor, who unthinkingly robo-dials the same person hundreds of time over many months without pausing to wonder why it cannot reach him, cannot complain about much higher liability. In sounding the alarm about over-deterrence, [the defendant] also misapprehends Congress's intent: whatever balance Congress sought to strike between protecting consumers and enabling businesses to reach them is inapplicable where, as here, the caller is merely harassing its customers about outstanding bills.

*King v. Time Warner Cable*, 113 F. Supp. 3d 718, 727 (S.D.N.Y. 2015), *vacated and remanded sub nom. King*, 894 F.3d 473 at 482[17].

Third, the "intent for treble damages does not require any malicious or wanton conduct, but rather is satisfied by merely 'knowing' conduct." *Alea London Ltd*., 638 F.3d 768 at 776.  This fits Defendant's conduct in this case perfectly. Defendant knew it was autodialing millions of customers, knew that it was not checking for cell phones, merely assumed that it had the consent, and take reasonable procedures.

Fourth, Defendant failed to properly "scrub" Plaintiff's number to see if it was a cell phone number, even though it had been told to do so by the FCC in 2008. *See 2008 TCPA Order*, 23 F.C.C Rcd. 559, 565 (F.C.C. 2008). On January 4, 2008, the FCC released an order clarifying that debt collectors making dialer calls to cell phones are subject to the strictures of the TCPA.  *Id.* The FCC stated, "we expect debt collectors to be able to utilize the same methods and resources that telemarketers have found adequate to determine which numbers are assigned to wireless carriers, and to comply with the TCPA's prohibition on telephone calls using an autodialer or an artificial or prerecorded voice message to wireless numbers." *Id.* at 9 (emphasis added).  In doing so, the FCC provided names and websites for scrubbing services.  *Id.*  Therefore, Defendant knew or should have known that they were calling Plaintiff's cellular telephone. It was the Defendant's responsibility to determine if a phone number is a cell phone before calling it

---

[17] Nothing about the Second Circuit's reversal of *King* changed the decision or reasoning concerning willful violations of the TCPA. As noted above, the decision in *King* was remanded

with an autodialer.   Despite the issuance of the 2008 FCC Order, it is apparent that Defendant failed to undertake or address the cell-phone scrubbing requirement as evidenced by its own admission.  More importantly, Defendant admitted to having access to such information and refused to do so.

In sum, Defendant did use an ATDS to robocall Plaintiff's cellular telephone 140 times and every material fact in this case leads to that singular conclusion. Defendant willfully treated Plaintiff's cellular telephone number as though it had Plaintiff's prior express consent to robodial him—when it in fact had none. Defendant willfully ignored its obligations to investigate this number to determine who owned it before it robodialed it.   Accordingly, Defendant should be held liable to Plaintiff for willful damages under the TCPA

<u>**CONCLUSION**</u>

For the reasons mentioned above, Plaintiff respectfully requests that this Court deny Defendant's motion in its entirety.  In addition, Plaintiff respectfully requests that this Court grant his motion for Summary Judgment.

**TARSHISH CODY, PLC**

Dated:  October 4, 2018                By:   s/Adam R. Strauss
                                              Adam R. Strauss (#0390942)
                                              ars@attorneysinmn.com
                                              6337 Penn Avenue South
                                              Minneapolis, Minnesota 55423
                                              Telephone: (952) 361-5556
                                              Facsimile: (952) 361-5559

---

other "<u>limited</u>" grounds after the decision in *ACA International*. *See King*, 894 F.3d at 482.

**ATTORNEYS FOR PLAINTIFF**